Mr. Johnson, you may proceed. My name is Doug Johnson. I represent Ms. Hall. Ms. Hall is currently serving 14 years pursuant to her drug abuse homicide conviction. I'd like to address the third issue regarding the jury instruction in my brief. I do want to make a quick reference to the first issue because I don't believe it's a throwaway issue. I believe Ms. Hall did make an uncritical and unambiguous request for an attorney. She said, you can get, she read the rights, she signed it, and then she said, you can get me an attorney. Did she then continue to speak? She did continue to speak, but if that's the law, then what does it mean to ask for an attorney? Something had to happen there. This isn't like the countless cases where someone says, maybe I should get an attorney, or do you think I'd get an attorney, would an attorney help me? She said, you can get me an attorney, and it was completely ignored. And if that's the law, and then the state can always say, well, she just kept talking then. She put the ball in the police officer's court. Wouldn't that be, in effect, reinstituting conversation with the police? I don't think she, it never stopped, so how can she reinitiate under Edwards? Well, that's my point. She just keeps right on talking and going on and on and on for the next hour. She did. I mean, at what point does she take a breath and say, okay, well, now where's that lawyer? Well, I believe she put the ball in the police officer's court when she said, you can get me a lawyer. Right, and let's assume that was a clear invocation. I think there's nothing else. She then begins to reinitiate conversation with the police. Didn't the police officers have to stop to give her a chance? I mean, perhaps they leave at that point. Do they tell her to stop talking? I don't know. Is that an obligation on their part? I don't believe it's an obligation to stop, but I think it's an obligation for them to say, I'm sorry, they don't have to tell her to stop talking, but they stop, and then. But they weren't talking is my point. She was. Well, I think, I don't know how much, I don't want to take too much time on this because I'm not sure I'm going anywhere with it, but I think our position is clear. It's clear. With regard to the third issue, which I know this court is intimately aware of, on Neary, I hope I'm pronouncing that right. These jury instructions, there was error in these jury instructions. The parties struggled with it. I understand that. They worked hard, but error occurred, as we know, from what the Supreme Court said in Neary. We agree with the appellate court that this jury instruction should be modified in limited circumstances, such as these, where the defendant delivered multiple controlled substances, fentanyl and heroin, to the victim, but is charged with drug and use homicide on the basis of only one of those, the heroin. This jury was misled, if you look at these instructions as a whole, we believe, into thinking that the uncharged act of delivering the fentanyl was a separate basis for convicting Ms. Hall of drug and use homicide. So I think the only, there are two issues. One, the state says that the defense invited this error, and two, was it harmless error? I know this court found harmless error in Neary, and the Supreme Court agreed with that decision, but I believe this case is different. The state argues, well, in the jury instruction the defendant proposed, you used the term acts. So how can you complain now that the term acts referred to both cocaine and fentanyl deliveries? In your own instruction, you used the term acts, and while it's true that the term acts was used in the defense instruction, the term acts was limited to the delivery of heroin. In the defense instruction, it was specifically referenced and limited, the acts were limited to the delivery of heroin. Not true for the state's instruction, not true for the court's instruction that was ultimately submitted. So when we look at the doctrine of invited error, this isn't where the defense sat idly by and said, well, I hope that this is accepted, and then our appeal will argue that it was wrong. Context is everything. The defense instruction said delivery of heroin, and that was what the defense was trying to do, focus on only the delivery of heroin. So I really believe the issue is, was the error harmless in this case? And I believe if you look at the jury instructions as a whole, you would determine that, unlike Neary, it was not harmless in this case. Neary, we had a delivery of cocaine and a delivery of heroin. Here we had a single delivery of two controlled substances, a concoction as it were. Heroin and fentanyl, and by the way, the trial court found, and we agree, this defendant, even if you believe, I'm assuming here that you believe the state's evidence was sufficient, that the defendant indeed did deliver these substances. Even if you believe that, the trial court found the defendant did not know this heroin was called fentanyl. So the heroin and fentanyl were delivered in a single act as one concoction. But then the jury was instructed, in order for you to find that the acts of the defendant caused the death of Chelsea Coon, the state must prove beyond reasonable doubt that the defendant's acts were an independently sufficient cause of death. I submit to you that reading this, the most logical conclusion for the jury then is that the defendant's acts were the delivery of heroin and the delivery of fentanyl. If that was not how that should be interpreted, then the jury should read the act, their instructions should read the act of delivering the heroin. The only possible reason, after this jury has sat through all the evidence, the only reason to include acts plural would be to have the jury consider the delivery of the fentanyl to the victim and convict her if they believe the fentanyl killed the victim. And that's why I believe this is different than Neary. In Neary, it was two drugs separate, not one substance. Two distinct acts, two distinct controlled substances. Here, Dr. Peters, the forensic pathologist, I submit the man who knew the most, said he made clear fentanyl alone could have killed this victim. But when he was asked if he could say that heroin alone, at the end of the cross-examination, they said, can you say beyond a reasonable doubt, I'm sorry, can you say to a reasonable degree of medical certainty that heroin alone killed this victim, he could not do so. I do concede that toxologists testified that both alone could do it, but he wavered and he is not a medical doctor. And he also said any amount of heroin could kill. So his testimony... Well, is that proven false? I don't know that it's proven false, but I think it detracts from his testimony and makes it not as clear as in Neary, where the medical evidence was, this could have killed on its own, this could have killed on its own. When you have Dr. Peters not saying to a reasonable degree of medical certainty that heroin could have done it on its own, I believe that's one distinction from Neary. So no, it is not proven false, Your Honor. But I believe it detracts from his testimony. Did these jury instructions fully and fairly state the applicable law and convey to the jury that the proper focus was on the defendant's act of delivering the heroin and not the fentanyl? I think that's where it falls short. On 1894 of the record, the jury instructions start, and the jury is instructing the defendant is charged with drug-induced homicide, not drug-induced homicide caused by the delivery of heroin, just drug-induced homicide. The instructions go on, there's no reference to heroin. The word heroin is not used. And then on 1901, the wording is, and this is in the IPI, but I submit that if you look at these as a whole, at these instructions as a whole, the proper law was not conveyed. On 1901, it says a substance-containing heroin. And I referred earlier to the concoction. This was the delivery of fentanyl and heroin in one concoction. So if you read a substance-containing heroin, the jury would think, well, that substance-containing heroin was the fentanyl. That mixture included fentanyl and heroin. Are you, am I mischaracterizing your argument by saying that you're arguing a but-for case as opposed to just arguing that there's a conflation or an ambiguity here? I'm not arguing a but-for case. I believe that I can't do that after the Supreme Court's decision. But I am arguing that there's an ambiguity here because if this jury decided, I believe these instructions conveyed to the jury, if you believe fentanyl on its own killed this victim, you could convict her of drug-induced homicide. Because that concoction, that substance-containing heroin was fentanyl. So I believe there's a conflation or a ambiguity that misled the jury. There was so much talk about fentanyl. And then when we refer to it as a substance-containing heroin, that's why harmful serenity, but not here. Didn't the jury get IPI 7.28 where they were instructed that the defendant in this case had annoyingly delivered to another controlled substance-containing heroin? Yes, saying that's the second reference of substance-containing heroin. And so I believe those two references, heroin, it's never just said in the jury instructions, delivery of heroin. The two references in 7.28, as Your Honor mentioned, is a substance-containing heroin. So again, I think it has the same, it suffers from the same problem. Really, the gist of it is because this was one packet. It wasn't, here's your heroin, here's your fentanyl. And that's why you think this is different. As opposed to if the heroin had been cut with aspirin, it's heroin, basically. If it had been cut with some other benign substance. But because it was fentanyl, and there was testimony that fentanyl alone could have killed her, and testimony from the toxicologist that without the heroin, excuse me, without the fentanyl, the heroin amount would have killed her. Yes. It was the toxicologist, not the pathologist.  Very strong evidence all over the fentanyl. If there had been a delivery of two packets, for lack of a better way to describe it, one containing heroin, one containing fentanyl, then your argument would not be the same. Argument would not be the same. And I believe I can still make an argument that the jury instructions misled the jury in this case. But I believe my burden before your honors this morning is to show you why you should not find, I believe you'll find error. But I believe I have to show you, convince you, that it was not harmless error. And if this was a delivery of fentanyl, and a delivery of heroin in two different acts, then that would be harder. I believe if we look at the jury instructions as a whole, and we look at substance-containing heroin, that's where the jury cannot hear, because of a conflation, because of an ambiguity, because it's just very hard to understand jury instructions that do not make it clear. You have to find beyond a reasonable doubt that the delivery of heroin was a contributing cause to her death. These jury instructions are different than what happened in Neary. So I believe it does matter, although it is not just positive, that this is one concoction containing fentanyl and heroin, because the concoction delivered could have been considered a substance-containing heroin. And if that substance-containing heroin was fentanyl, and the jury concluded only fentanyl alone caused the death and not heroin, we still could convict pursuant to these jury instructions. And I think it's important to note also, different than Neary, is that there was no evidence that the defendant knew here, the traveler found, that the defendant knew there was fentanyl in this concoction. What was that based on? I think that there was no testimony of evidence. Was that a stipulation? Was that an agreement? I don't know if it was a stipulation, but I know it was a finding made during the jury instruction conference. And so I think the fair thing to do here is to remand the case for jury instructions that would properly separate out, I think, as I looked at the new pattern instruction, which now has bracketed material, as I read it, that would now say, have you add in the bracketed material, delivery of heroin in this case, pursuant to what happened in Neary in the current state of the law. And if there are no more questions, that's our position. You mentioned Animus in your brief. Animus, in your brief, I think, did you not? With regard to Issue 2, with regard to Issue 2, we believe that the vial, the loaded syringe, should have been collected, and there was no reason for it not to be collected, especially when, A, it was there at the scene. I think the state says, well, look how fluttered it is. You can't expect everything to be collected. I think that ignores that this is a crime scene, and we're talking about homicide. You said there's no reason. Could you qualify that a little bit? Because it strikes me as befuddling to suggest that something had no reasonable or reasoned cause. It almost sounds as if you're saying this is a random act. Well, I guess no justifiable reason, perhaps looking to prove a homicide. Well, one reason could be somebody was animated against your client, correct? I mean, that's your argument. And there are lesser degrees of Animus, or there are lesser degrees of evil or hate, and one of them is negligence. One is forgetfulness, not necessarily negligence. So when you said there's no reason, I assume that you're at least attempting circuitously to argue that this did not constitute negligence. I didn't mean to be... I didn't mean to be circuitous. Because there is state law that says that negligent loss of evidence is not necessarily proof of Animus, and is not necessarily something that would result in some sort of ruling or finding in order to alleviate the prejudice that might arise from such an act. Well, we are... I'm not talking about negligence. I do agree, negligence is not Animus. But here we have... we're talking about a homicide investigation to take away someone's freedom. And Animus against the drug use, the epidemic that seems to be sweeping our state, our country, a loaded syringe in this crime scene, and then Ms. Kuhl calls up and says, oh, by the way, I found a loaded syringe, and nothing is done to track that down. Nothing... the syringe was not raised in any trial... motion for the trial, post-trial motion, correct? I don't believe... no, I don't believe... so the post-trial motion was actually not made until after sentencing, so I don't know what was going on there. But no, it was not. But that's the point of the... So is your point that, hey, look, you know, we all acknowledge we have an opioid problem. But this woman calls and says, I found a loaded syringe, and that the police don't go to try to find this as a safety issue, a public concern issue? On the spectrum of negligence to... I agree. There is a... is it Animus? Why would somebody have it out for this defendant? I just submit under these facts that steps should have been taken, especially once the mother said, I found this loaded syringe, to go try and obtain this loaded syringe. But she said she threw it out, right? She said she threw it out. Could it have been tracked down? Did she throw it out in the house? Was it still there? Where did she put it? Did she put it in the garage? I don't know. But it seems to be crucial evidence that would possibly keep us from being here today. Well, here, let me ask you the follow-up question then. Let's assume they had recovered it. What impact would that have had on your case? If the syringe... if the syringe had heroin that was not connected to this defendant in any way, perhaps, not containing fentanyl, some other thing, and then it turned out to be... one could... that would give the defense an argument to say, hey, this is something that she was using. She got it from someone clearly not from this defendant. Therefore, that's reasonable doubt that anything this defendant delivered to this person caused her death. It would have given the defense another argument to show that heroin from somewhere else is what killed this defendant. I'm sorry, Mr. Baker. Are there no further questions? We ask the case to be remanded. Thank you. You'll have an opportunity to make rebuttal. Ms. Lee. Good morning, Your Honors. May it please the Court, Counsel, Stephanie Lee on behalf of the State. As far as the attorney request, obviously, the alleged attorney request, you can see the recording in its Exhibit 50. And what the defendant did in the course of arguing with this police officer is said, well, then you can get me a lawyer because you can't tell me what I did if I know what I did. You, I have all missed calls from the girl on the 6th. I already knew this shit was coming today. They already said all this shit. They already said, or they said that her boyfriend said that I was in her, in his fucking house in Marengo and left her foaming at the mouth. At that point, I would say that's not an unambiguous request regardless because it says, it's kind of explaining why she thinks she might need a lawyer but not really asking for one right at that moment. But either way, she continues to talk. There is no way that an officer could have even begun to interrupt her, nor do they need to under the case law. I don't know of anything that says that the officers need to make her stop when she's continuing to talk. So I think that that is not an unambiguous request. And even if it is, she did, in fact, reinitiate. They had no obligation to clarify it and they certainly had no opportunity to clarify it either. And so I think that the trial court was right that the demeanor of the defendant, everything that you can see on that video tells you that this was not, you know, voluntary. And it was also, she did not invoke her right at that time. As to the jury instructions, I'll go in the order that defense went. I don't recall the judge making a specific factual finding that she didn't know there was fentanyl in there. We don't know either way. She may or may not have. I agree that it was heroin that was, in fact, charged in this case. And that was clearly explained to the jury during the issues and the elements instruction, referenced the delivery of heroin specifically, which is common law page 530 to 531 shows the instruction. And then it's also on, I believe, 1901 to 1902 of the ROP. And so the other thing is that either way, if the court followed the actual IPI, which is what the court's required to do if it states the law, then in fact it would be even more, it'd be less beneficial to the defendant because it actually was saying the contributing cause versus a but-for kind of analysis, which is what the defendant want and substantially what the court did when she said it must be an independently sufficient cause. And that's not, we all know, you know, that obviously at this point, contributing cause is 100% enough. And as to that, I would point the court, it actually was the pathologist, Peters, on page 1278 of the record. He said, well, if it was just fentanyl alone in her tox, then yes, it's definitely high enough to have caused her death. She also has a really high level of morphine in there from heroin. So that alone also could have caused her death. The two together really could have caused her death and did. So it's the two together. And all throughout his testimony, he continually says it was the adverse effects of heroin and fentanyl, both of them. So you only need the contributing cause. He's already testified that the heroin level in and of itself would be sufficient. That's more than enough to find that causation. In terms of raising this argument about acts after the fact, it was not raised at the trial level that it shouldn't have been plural. In fact, what the defendant did, there were several acts leading up to the delivery, obviously packaging, I assume, bringing it over to her, the text they pulled back and forth. There was one delivery of four packets that were found, the pink packets in the room. So that's actually four packets. Yes, they had both heroin and fentanyl in them. At least one was tested and had fentanyl. The other three, the person testing it said, I didn't need to test the other three because I knew they had heroin. So they only tested the one to show both fentanyl and heroin, but she had both in her system. But the forensic pathologist specifically said that that heroin would have been enough and was a contributing cause because the two together could have caused her death and did. So I think it's very clear that that, in fact, is the case. And as to issue number, I think it was two of the alleged syringe, Lori Cole, although the officer testified that Lori Cole had called him and said she found this syringe, Lori Cole herself actually denied that she ever found it or called him because she said she wasn't the one who cleaned the basement. She did not call and say that. And that's her testimony. She denied it on page 978 to 80 of the record. And the state absolutely acknowledges that in one of the pictures of this extremely cluttered drug scene, there is some kind of a syringe sitting on one of the dressers by where the victim had been found. But there's no indication that the officer actually saw it, that he knew about it. It was in a picture, but the whole room was so chaotic that the paramedics actually said when they first came in, they thought that they were going to save her. And so they actually had to move her out of there for the safety of the paramedics and the officers to try to revive her, which they did try, and they were unsuccessful. So when they first came upon this, it was not a crime scene. They thought she felt a little more to the touch. They thought maybe they could save her. And they thought for the safety, they had to move her. Women, women, you're telling me that they moved her before they gave her Narcan? Yes, they said that they had to. They moved her to the ambulance, yes, they did. Wow. Because they said in this room, they could not treat her Is it the state's position that a cluttered crime scene negates a police officer's obligation to collect all the evidence? Well, you are not obligated to actually collect evidence under the law. You're obligated to preserve what you do collect. If they negligently destroyed something, that's not good. They didn't destroy anything here. No, so you're telling me that there's a victim lying either on the bed or right on the floor next to it. There's a syringe right there. You have paramedics that are taking her outside to revive her, and that that's not evidence that should be picked up? I mean, is that your position? Those people didn't pick up any of the evidence. The police officers that came in. Is it your position that that would not be an expected act by a police officer or an evidence tech? It may very well have been a sloppy investigation, not a perfect investigation. I don't know if the officer at the time did in fact notice that syringe or not. There's no evidence that he did. He said he collected everything to the best of his ability. Was there an evidence technician on scene? I think it was Detective Bach that collected most of the evidence. B-O-E-C-K-H. And he said he believed he searched the whole basement and collected evidence to the best of his ability. Did the photograph show that there was anything inside the syringe other than air? It appears. I mean, we can't tell from a photograph, but it does appear that there's some kind of a liquid in there. But again, if it's only potentially exculpatory, then they have to actually show bad faith in failing to preserve this, keep this collected, because the thing is that at the time, they certainly didn't know that it was Darrell Hall at that time. At best, they knew there was somebody who had delivered this drug to her, which she called her medicine. But we didn't know who. Nobody knew at that time. It wasn't until later. So there certainly couldn't have been animus towards Darrell Hall at that time, because they didn't even know who was a suspect at that time. And actually, again, when they first came in, they really were hoping and thinking that they could save Chelsea, which they unfortunately were unsuccessful in doing. But again, we don't know. We know that there's a picture showing a syringe of some kind. We know that Lori Kuhl says, I never told the officer about it or anything about it. I never saw it. I never threw it out. That's all we know. And so that's the only record we have. And then we didn't have any kind of record made below to try to prove up any kind of an animus or any of those things. So it's forfeited. And to the extent the record is not clear of what happened, that has to be construed against the defendant. You're saying Youngblood, as cited in the brief, would require that the evidence tech realize that a loaded syringe could be used by the defense to argue that she obtained the heroin from another source. And so your position is that Youngblood doesn't require them to go beyond their initial examination of that home. Well, I think it's two pieces. If it's potentially exculpatory, that's when you have to show the bad faith. So if they looked at it and they knew it was exculpatory versus just potentially exculpatory. And there's nothing in the record that they ever saw the syringe? No, no. And in fact, the problem is that not having the syringe, of course, we don't know if it would be actually exculpatory or maybe even inculpatory. So in order to be, they have to show actual bad faith because it's only potentially exculpatory. And I think that's a big distinction there as well. And I think unless anybody else has any questions. Thank you. Thank you. I would ask the court to approve. Mr. Johnson, you may proceed. Thank you. With regard to the jury instruction issue, I just wanted to make sure the record is clear and that I did not misrepresent the record. Counsel read from 1278. When I stated about whether or not Dr. Peters was able to state that the heroin caused the death, I stated that he could not say it to a degree of scientific certainty. And if you go to page 1279, that is discussed. The question is, you cannot to any degree of scientific certainty say that it was the heroin alone, correct? Dr. Peters says, well, I've seen lots of heroin alone deaths of these amounts that have caused death. So had that been the only thing on her tox, I still would have confidently said that she died of heroin. Question, okay, but in this instance, it's not the only thing. So you couldn't say just heroin alone, correct? Answer, correct. Also with regard to the, whether or not Ms. Hall... How is that abstract? I believe that if it cannot, it is evidence. Again, it gets back to the jury instruction issue that it was not clear in this case. The evidence was not strong that heroin alone could have caused the death. So the jury, because of these jury instructions, would be led to believe that fentanyl, if fentanyl caused the death, and that's a controlled substance mix, then they could convict her. And that's how it plays into our jury instruction argument. With regard to Ms. Hall's knowledge of the fentanyl, there was an express finding on 1771. The judge said the testimony further indicated that the only person that would know what is in the heroin is the individual who cut the heroin. There has been no evidence presented in this case that Ms. Hall in any way was cutting heroin, or that Ms. Hall knew that there was fentanyl contained in the heroin. With regard to the statement, just a comment that Ms. Hall said, you can get me an attorney then because you can't tell me what I did if I know what I did. The state says, well, that makes it conditional. I don't believe that it makes it conditional. I believe it strengthens her request for an attorney because she says, I want an attorney and here's why. So I don't believe the because statement weakens or makes it an ambiguous request. And finally, with regard to the young blood argument, I just believe that we don't have to show hatred for Durell Hall. We do have to show, because this is potentially exculpatory, beyond negligence. And I think we quote Black's Law in our brief, dishonesty. Something here beyond negligence caused this loaded syringe not to be collected. Whether the basement's cluttered or not, I believe in this crime scene that there has to be a justifiable reason or we have enough animus, ill will, dishonesty to show that the young blood standard is met. Was there any proof about the syringe? There was a picture of it. So for those reasons, collect the syringe. It's certainly potentially exculpatory because it gives the defense an argument if indeed the testing shows it's not connected to the defendant. So for all those reasons we ask that the case be remanded. Thank you. Thank you. Take the case under advisement. There will be a short recess. We have other cases on the call.